# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AUDREY YUDENKO,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 06-4161** |
| | : | |
| **VINCENT GUARINI, et al.,** | : | |
| **Defendants** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                    **August 27, 2008**

Defendants have filed two motions for summary judgment in this action alleging civil rights violations under 42 U.S.C. § 1983 and the Americans with Disabilities Act ("ADA"), as well as Pennsylvania state law claims. Plaintiff brings this suit as a result of injuries he received while he was incarcerated within the Medical Housing Unit ("MHU") of the Lancaster County Prison, from April 18, 2006 until October of 2006. In response to the Motion for Summary Judgment of Robert Doe, M.D. (Document #49), plaintiff filed a Certificate of Non-Opposition (Document #50-4), certifying that he does not contest the motion. I will therefore grant Dr. Doe's Motion for Summary Judgment and enter judgment in his favor. Remaining before me, therefore, is the Motion for Summary Judgment by defendants Guarini, Seibert, Bodnar, Weaver and Lancaster County (Document #47). In accordance with the following discussion, I will deny the motion as to plaintiff's ADA claim (Count II), his state tort law claim (Count III), and his request for punitive damages, granting the motion in all other respects. I will also dismiss plaintiff's claim under the Pennsylvania Constitution without prejudice.

I.    **BACKGROUND**[1]

Audrey Yudenko was incarcerated at the Lancaster County Prison ("LCP"), and housed within the MHU from April 18, 2006 until October 2006.  LCP is funded and operated by Lancaster County and is also a recipient of federal funds.  Warden Guarini is responsible for the overall operation of the prison, including oversight of the medical department.  (See Pl.'s Mat. Facts, App. 75, Warden Vincent Guarini Deposition, Mar. 24, 2008, N.T. (hereinafter "Guarini Dep."), 9:10-13; 15:24-16:7).  Deputy Warden Lance Seibert and Associate Warden Robert Bodnar also have authority to correct prison operations that could lead to constitutional and statutory violations.  (See Pl.s' Mat. Facts, App. 90, Lance Seibert Deposition, Mar. 24, 2008, N.T. (hereinafter "Seibert Dep."), 12:10-13:10; Pl.'s Mat. Facts, App. 102, Robert Bodnar Deposition, Mar. 24, 2008, N.T. (hereinafter "Bodnar Dep."), 13:14-14:12.)  At all relevant times, the LCP medical department staff, except for Doctor Robert Doe, were employees of Lancaster County.

Mr. Yudenko claims violations of his rights under the Eighth Amendment of the U.S. Constitution, the Americans with Disabilities Act, and Pennsylvania state tort law arising from the treatment he received while incarcerated.  According to plaintiff, defendants' deliberate indifference, negligence and failure to provide legally required accommodations resulted in a fall down a flight of stairs, injury from a bed bunk breaking from the wall, and denial of access to prison services.

---

[1]I have viewed the facts in the light most favorable to the plaintiff, as the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Prior to the relevant term of incarceration,[2]  Mr. Yudenko injured his left ankle and back when he accidentally fell from a roof while working as a construction worker in August 2005.  Due to lingering pain from the ankle injury, he still walks slowly.  He was unable to participate fully in the medical intake process upon arrival at LCP in April 2006: he did not receive a full physical at LCP, and his medical file does not include a completed physical exam form.  During the intake process, a staff member told him that he did not need to be examined because he had already been there.[3]

There are approximately 48 inmates housed at the MHU, meaning that Correctional Officers likely had daily interaction with most of the inmates.  (See, e.g., Pl.'s Mat. Facts, App. 64 (Brian Weaver Deposition, Mar. 24, 2008 N.T. (hereinafter "Weaver Dep."), 24:2-5.)  Yudenko was assigned to the second tier of the MHU, located on the second floor.   Because of his previous injury, Mr. Yudenko needed to use the handrails to descend the stairs.  Correctional officers in the MHU attended medical staff meetings and received training instruction to be observant of inmates.  (See, e.g., Weaver Dep. 46:1-7; Doe Dep. 30:10-12.)

---

[2]Mr. Yudenko was incarcerated at the Lancaster County Prison from Dec. 31, 2003-May 19, 2004.  (See Pl.'s Mat. Facts, App. 201 (LCP Inmate Housing Cost Information Form).)

[3]See 37 Pa. Code § 95.232(3) (detailing when a physical exam is required within 14 days as part of the intake process).  Dr. Doe notes that occasional exceptions are made where an individual was previously incarcerated at the facility.  (See Pl.'s Mat. Facts, App. 131 (Robert G. Doe Deposition, Feb. 8, 2008, N.T. (hereinafter "Doe Dep.") ("There are exceptions to physicals. One of which is that they have had one within the last year if there is a previous incarceration.  I don't know if that applies with [Yudenko] or not.").)

Around dinner time on May 8, 2006, Correctional Officer Brian Weaver, working the 4:00 p.m. to 12:00 a.m. shift at the MHU, ordered Yudenko to move his belongings to a new cell.  Yudenko told Weaver that he had leg and back problems, but Weaver instructed him to carry his box, which was large, heavy and difficult to balance, to the ground floor.  (See Defs.' Mat. Facts, Ex. F, Audrey Yudenko Deposition, Jan. 25, 2008, N.T. (hereinafter "Yudenko Dep."), 102:18-105:17.)  Block or inmate workers, known as volunteers, were available to assist in carrying Yudenko's box.  (See Seibert Dep. 27:19-28:9 (I note that Mr. Seibert does not state whether or not volunteers were available at the time of the incident).)  When Yudenko tried to navigate the stairs while carrying the box, he fell to the bottom.  He states that this fall increased the pain he already experienced from his previous injuries, and that he suffers from headaches and leg pain.  (See Yudenko Dep. 120:20-122:8; 133:18-134:5; 135:10-22.)

On May 12, 2006, Mr. Yudenko's left ankle was x-rayed at the Lancaster County Prison facility.  Another x-ray was taken on July 7, 2006, and compared to the earlier film.  According to the radiologist's interpretation, there was no evidence of fracture or other recent acute trauma or joint pathology.  On July 28, 2006, plaintiff underwent an MRI, the results of which showed a compression fracture and early degenerative narrowing at L3-4 and L2-3.  (See Defs.' Mat. Facts, Ex. A, 18 (Report by MRI Group–Lime Street, hereinafter "MRI Report.")

Mr. Yudenko's new cell did not contain the handlebars he needed to hoist himself

4

out of bed, so he began to sleep on the floor of the cell.  (See id. 139:3-140:1.)  He would

pull himself up from a prone position on the floor by holding onto the side of the bed.

(Id.)  The bunk in his cell was bolted and welded to the wall, and did not have legs.  (See

Guarini Dep. 54:10-22.)  Mr. Yudenko admits that he did not formally request

accommodation to help him out of his bed.  (See Pl.'s Mat. Facts, ¶ 23 (responsive to ¶ 24

of Defs.' Mat. Facts).)  On August 4, 2006, after nearly three months of sleeping on the

floor, the welding broke on Mr. Yudenko's bunk, causing the bunk to collapse and

injuring Yudenko.  (See Pl.'s Mat. Facts, App. 18 (LCP Unusual Activity Report, Aug. 4,

2006); App. 122, Edward Sutton Deposition, Mar. 24, 2008, N.T. (hereinafter "Sutton

Dep."), 22:20-26:9.)  Correctional Officer Sutton saw Yudenko on the ground, observed

that the bunk "broke off the wall," and saw that Yudenko was bleeding from his forehead.

(See LCP Unusual Activity Report, Aug. 4, 2006; Sutton Dep. 22:1-26:9.)

    When the bunk fell, Yudenko felt something "snap" in his lower back and he hit

his head against the wall.  His medical progress sheet shows Mr. Yudenko "stated that he

hit his head against the wall and his forehead hit the metal edge of the bunk itself."  (Pl.'s

Mat. Facts, App. 161, LCP Medical Record, Progress Sheet.)  After the incident plaintiff

complains of increased pain and numbness in his legs, arms and hands.  (See Yudenko

Dep. 189:5-7; 204:7-20.)  His condition has worsened and he now requires a wheelchair

to move around.  (See Yudenko Dep. 161:15; Pl.'s Mat. Facts, App. 203-210 (York

County Prison Medical Record) (indicating that Mr. Yudenko is wheelchair-bound, as of

May 2, 2007); Pl.'s Mat. Facts, App. 211-225 (Dep't of Corr. Medical Record) (same).

      A CT scan of plaintiff's head was performed at Lancaster General Hospital on August 18, 2006, indicating "no acute massive bleed or significant change." (See Pl.'s Mat. Facts, App. 159 (LCP Medical Record).) That same day at Lancaster General, doctors x-rayed plaintiff's neck, finding no evidence of acute trauma. (Id.) While incarcerated at LCP, plaintiff was prescribed and administered pain medications including Tylonol, Elavil, Antivert, Motrin and Robaxin (although these medications were discontinued on August 30, 2006). He also received outpatient treatment from Dr. Zartman at Lancaster Orthopedic Group ("LOG") on August 31, 2006 and September 28, 2006. (See Doe Dep. 54:24-56:8.)

      The maintenance staff at LCP is responsible for maintaining and upkeep of the prison, including cells and cell bunks. (See Guarini Dep. 52:1-53:7; 55:11-56:8.) At the time of the incident, the bunks in the MHU were approximately 15 years old, and they had broken in the past. (See Guarini Dep. 53:8-54:9.) Warden Guarini stated at his deposition that no records are available concerning inspection and maintenance of the bunks. (See Guarini Dep. 55:2-6 ("I doubt there would even be any [records]. The reason I say that is because you go up and fix it. That's about it.").)

      On August 14, 2006, Yudenko requested double "block-out" (recreation) time so that he could exercise and stretch, as a form of physical therapy for his injuries. (See Pl.'s Mat. Facts, App. 8 (Inmate Request for Medical Services ("IRMS"), Aug. 14, 2006).) In

6

the "Treatment" section of his request, a staff member writes "You are already scheduled for a follow up appt."  (Id.)

On August 24, 2006, while Mr. Yudenko waited in line to receive medication (as he was required to do), Officer Weaver informed him that he was not on the medication line ("medline") on time and would lose his block out time.  (See Pl.'s Mat. Facts, App. 2, Declaration of Audrey Yudenko (hereinafter "Yudenko Decl.") ¶ 11.)  When Yudenko rested on the steps on his way back to his cell, Weaver removed his block out time for two days.  (Id. at ¶ 12.)  Yudenko also accuses Weaver of refusing to supply medical request forms, forcing him to climb a flight of stairs to make telephone calls (there was a lower tier telephone available).  (See Pl.'s Mat. Facts, App. 16(c) (General Purpose Request Form ("GPRF"), Oct. 1, 2006.)

On August 25, 2008, Yudenko requested that medication be brought to his cell because the pain in his legs made it difficult to walk to the medline.  Nurse Amy Hill responded to Yudenko's request, "We [the medical department] cannot do this.  You'll need to come up to get your meds."  (Pl.'s Mat. Facts, App. 9 (IRMS, Aug. 25, 2006).)  Yudenko also submitted a grievance to Associate Warden Robert Bodnar.  In response, Mr. Bodnar informed Yudenko, "After reviewing your chart with medical, I tend to agree with their advise [sic] that you leave your cell when med line is first called, not at the end of the line."  (Pl.'s Mat. Facts, App. 15 (GPRF, Sept. 4, 2006).)  Yudenko states that at times he would not get his medication because he was unable to walk to the medline in

7

time.  (See Yudenko Decl. ¶ 14.)

Throughout August 2006, Yudenko filed requests and inquiries about pain control (See Pl.'s Mat. Facts, App. 4, 5, 7, 11 & 12 (IRMS forms).)  He states in his declaration that sometimes the pain was so severe that he had to walk on hands and knees to use the toilet.  (See Yudenko Decl. ¶ 10.)  In spite of his appeals, on August 30, 2006, prison staff stopped Yudenko's pain medication.  (See Pl.'s Mat. Facts, App. 158 (LCP Medical Record); App. 11 & 12 (IRMS Sept. 1, 2006).)  On September 1st and 4th, 2006, Yudenko inquired as to why the medication had been stopped.  (Id.)  According to Doctor Doe, the nursing staff never forwarded these complaints of pain or requests for medication to the physician on staff.  (See Doe Dep. 56:14-59:4.)  Doe explained in his deposition that most medical requests and accommodation issues are handled by nursing staff, not physicians.  (See id. 25:5-11; 27:13-28:5.)

Mr. Yudenko notes that there is no ADA coordinator at LCP, and that the function is performed through the county human relations office.  No staff member at LCP is designated to be the primary person responsible for ADA compliance.  LCP provides no specific training to correctional staff related to the ADA or working with individuals with physical limitations.  (See Pl.'s Mat. Facts, App. 125, Miguel Albino Deposition, Mar. 24, 2008, N.T. (hereinafter "Albino Dep."), 19:3-20:8 (indicating witness does not recall if he received training or not); Weaver Dep. 11:18-12:1 (same); Sutton Dep. 12:5-12:12 ("not that I believe so, no").)

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex

9

Corp. v. Catrett, 477 U.S. at 322.  Under Rule 56, the court must view the evidence

presented on the motion in the light most favorable to the opposing party.  Anderson v.

Liberty Lobby, Inc., 477 U.S. at 255.  The court must decide not whether the evidence

unmistakably favors one side or the other but whether a fair-minded jury could return a

verdict for the plaintiff on the evidence presented.  Id. at 252.  If the non-moving party

has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of

material fact, then the court cannot credit the movant's version of events against the

opponent, even if the quantity of the movant's evidence far outweighs that of its

opponent.  Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363

(3d Cir. 1992).

## III.   DISCUSSION

### A.     Section 1983 Claim: Alleged Eighth Amendment Violations

In order to establish a § 1983 civil rights claim, Mr. Yudenko must show: "(1) that

the conduct complained of was committed by a person acting under color of state law;[4]

and (2) that the conduct deprived [him] of rights, privileges, or immunities secured by the

Constitution or laws of the United States."  Robb v. City of Philadelphia, 733 F.2d 286,

290-91 (3d Cir. 1984) (citing Parratt v. Taylor, 451 U.S. 527, 535, 101 S. Ct. 1908, 68 L.

Ed. 2d 420 (1981)).  See also Collins v. City of Harker Heights, 503 U.S. 115, 120 (1992)

(municipalities are considered "persons" under §1983, and can be liable for a

---

[4]Defendants do not dispute that their conduct was committed under color of law.

constitutional tort if the municipal entity was responsible for the violation).

To succeed on an Eighth Amendment claim, plaintiff must demonstrate: "(1) that the defendants were deliberately indifferent to [his] medical needs and (2) that those needs were serious." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999); see Estelle v. Gamble, 429 U.S. 97, 104 (1976) (establishing that deliberate indifference constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment).  An Eighth Amendment violation may also arise where conditions of confinement pose a substantial risk of serious harm.  See Farmer v. Brennan, 511 U.S. 825, 837 (1994) ("[T]he inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.")  In "prison-conditions cases," the inmate must also show "deliberate indifference" by prison officials to his health or safety.  Id.

In both cases, plaintiff must first make an objective showing that he has a "serious medical need," or that he is exposed to a "pervasive risk of harm."  See Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002); Riley v. Jeffes, 777 F.2d 143, 147 (3d Cir. 1985).  Next, a prisoner must make a subjective showing that the prison official knew of and disregarded either the prisoner's serious medical need, or, in a prison-conditions case, an excessive risk to the inmate's health or safety.  See Natale v. Camden County Corr. Facility, 318 F.3d 575, 582 (citation omitted); Farmer, 511 U.S. at 847 ("[A] prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and

11

disregards that risk by failing to take reasonable measures to abate it.")

_____With these principles in mind, I move to a discussion of plaintiff's claims against the various LCP defendants.

_____1.      *Individual Defendants*

_____a.      *Correctional Officer Weaver*

Mr. Yudenko alleges that Correctional Officer Weaver's deliberate indifference to the risk posed by the inmate's back and ankle injuries resulted in his fall while attempting to descend the stairs with his personal belongings–an unnecessary and wanton infliction of pain.[5]  See Farmer, 511 U.S. at 837.  He therefore states a prison-conditions claim against Weaver, and must furnish sufficient evidence for a reasonable jury to find: (1) a "pervasive risk of harm," and (2) "deliberate indifference" on the part of Correctional Officer Weaver, when he ordered plaintiff to carry his belongings down the MHU steps. Id.; Riley, 777 F.2d at 147.

I find plaintiff's evidence that his injuries posed a "pervasive risk of harm" factually insufficient to survive summary judgment.  Under Farmer and progeny, the requisite risk of harm "may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence

_____

[5]I have consulted the surveillance video of Mr. Yudenko's fall.  While defendants submit that it depicts conclusive evidence that "Mr. Yudenko's medical condition did not cause him to fall," I cannot agree.  (See Defs.' Br. 9 (citing Scott v. Harris, 127 S. Ct. 1769 (2007).)  The video is neutral in that any finding that plaintiff fell because he "missed a step" simply inverts two possible causes of the incident–the other being severe pain in his ankles and back.

and terror."  <u>Riley</u>, 777 F.2d at 147; <u>Helling</u>, 509 U.S. at 36 (prisoner must show that the

risk is so grave it violates contemporary standards of decency to expose anyone to it

unwillingly); <u>Oliver v. Bucks County Corr.</u>, 181 Fed. Appx. 287, 289 (3d Cir. Pa. 2006);

<u>Lehmann v. N.J. Dep't of Corr.</u>, 07-5964, 2008 U.S. Dist. LEXIS 14129, at *16-17

(D.N.J. Feb. 25, 2008).  Eighth Amendment conditions of confinement cases typically

involve risks to prisoners that threaten essential aspects of human dignity, such as sexual

assaults, physical attacks by other prisoners, and continuous exposure to toxic substances

or infectious disease.  <u>See, e.g.</u>, <u>Farmer</u>, 511 U.S. at 825 (transsexual inmate placed in

general male population despite risk of sexual assault); <u>Oliver</u>, 181 Fed. Appx. at 289

(risk of exposure to MRSA, where infections diagnosed each month from October to

February and there had been outbreaks in the past); <u>Beers-Capitol v. Whetzel, et al.</u>, 256

F.3d 120 (3d Cir. 2001) (sexual assault by guard); <u>Hamilton v. Leavy</u>, 117 F.3d 742 (3d

Cir. 1997) (transfer of inmate to prison where he had already suffered assaults by other

prisoners).  The risk underlying the stairway incident does not meet the <u>Farmer</u> standard,

both in pervasiveness and in severity; no reasonable jury could find otherwise.

　　　For plaintiff's claim to succeed, he would also have to establish that defendant

Weaver subjectively perceived an excessive risk of serious harm, and disregarded that

risk.  <u>Farmer</u>, 511 U.S. at 837.  Controlling precedent on prison-conditions cases dictates

that the risk of harm must comport with a denial of the Eighth Amendment's "evolving

standards of decency" component: such that a reasonable jury could find that harm was

inflicted upon plaintiff as a form of extra-judicial punishment.  See Helling, 509 U.S. at 36; Ford v. Mercer County Corr. Ctr., 171 Fed. Appx. 416, 421 (3d Cir. 2006).  The deliberate indifference standard is "a high one, . . . requiring actual knowledge or awareness on the part of the defendant."  Beers-Capitol, 256 F.3d at 137.  "Whether … prison official[s] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that … prison official[s] knew of a substantial risk from the very fact that the risk was obvious."  Farmer, 511 U.S. at 842.

Beers-Capitol, cited by plaintiff in support of his claim, actually cautions against a finding of subjective knowledge where the prison official affirmatively dismisses the alleged risk of harm.  256 F.3d at 140.  In Beers-Capitol, a unit manager reviewed previous complaints of sexual abuse against a particular guard by female residents in a juvenile detention facility, but disbelieved the allegations, stating that "these types of accusations occur on a frequent basis when female students become upset or angry with staff members."  Id.  The Third Circuit found the defendant's statement "illuminating of [his] subjective mindset of basic skepticism regarding the allegations," and "inconsistent with the subjective knowledge of a risk required for deliberate indifference under Farmer."  Id.

According to plaintiff, Correctional Officer Weaver also stated at the time of the stairway incident that he did not believe there to be a significant risk of harm to Yudenko.

14

(See Yudenko Decl. § 6.)  Yudenko does not repeat this allegation in his deposition

testimony.  (See Yudenko Dep. 102:18-104:24.)  Weaver testified at his deposition that he

did not know Mr. Yudenko's medical background and did not recall Mr. Yudenko visibly

walking with a limp.  (See Weaver Dep. 26:1-17.)  Weaver's Unusual Activity Report

does not describe the events that led to Yudenko's fall down the stairs, focusing instead

on the actions Weaver took in response to the fall, including summoning a nurse, who

determined Yudenko was still capable of moving to his new housing unit.  (See Pl.'s Mat.

Facts, App. 17, Unusual Activity Report, May 8, 2006.)

The paramount evidence of Weaver's state of mind when he allegedly ordered

Yudenko to descend the stairs with his belongings, then, is Yudenko's own statement that

Weaver disbelieved the existence of a risk of harm.  These facts are insufficient to meet

plaintiff's Celotex burden on the question of Weaver's deliberate indifference under

Farmer.  See Farmer, 511 U.S. at 842.  As the court noted in Beers-Capitol, Weaver's

chosen course of action "was imprudent, and in fact led to a very regrettable result," but

"it does not constitute deliberate indifference."  Id. at 141.

Accordingly, Mr. Yudenko's Eighth Amendment claim against defendant Weaver

must fail.  I will therefore decline to discuss Weaver's qualified immunity defense.

b.   *Supervisory Liability of Defendants Guarini, Seibert and Bodnar*

Plaintiff alleges that defendants failed to ensure he was properly classified and

placed according to his needs, but instead housed him on the second floor of the MHU,

eventually resulting in his fall down the stairs.  Again, plaintiff appears to state a

conditions of confinement claim on the theory that improper screening procedure

deliberately ignored a risk to his safety by placing him on the second tier.[6]  To establish a

supervisory prison-conditions claim, plaintiff must show that: "(1) the existing policy or

practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor

was aware that the unreasonable risk was created; (3) the supervisor was indifferent to

that risk; and (4) the injury resulted from the policy or practice."  Beers-Capitol, 256 F.3d

at 134 (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989)).  This four-part test

is "simply the deliberate indifference test applied to the specific situation of a

policymaker."  Id. at 135.

I have already found that the risk that plaintiff might fall while using MHU stairs

_____

[6] To the extent he states an indifference to medical needs claim, plaintiff's evidence is
legally insufficient.  "A medical need is 'serious,' . . . if it is one that has been diagnosed by a
physician as requiring treatment or one that is so obvious that a lay person would easily
recognize the necessity for a doctor's attention."  Monmouth County Correctional Institutional
Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. N.J. 1987) (citing Pace v. Fauver, 479 F. Supp.
456, 458 (D.N.J. 1979), aff'd, 649 F.2d 860 (3d Cir. 1981)).  If "unnecessary and wanton
infliction of pain," Estelle, 429 U.S. at 103, results as a consequence of denial or delay in the
provision of adequate medical care, the medical need is of the serious nature contemplated by the
Eighth Amendment."  See id. at 105.  Leaving aside the question of the severity of his medical
needs, plaintiff's prison medical records, together with the testimony of Dr. Doe, refute any
potential claim that he did not receive adequate medical care responsive to these needs.  Dr. Doe
points out that plaintiff refused both an MRI and further pain medication within a month after his
fall down the stairs.  (See Doe Dep. 45:21-46:9.)  His challenge to the intake system cannot
support a medical needs claim because he has not shown that he needed any more medical
attention than he received at that time.  (See Pl.'s Mat. Facts, App. 143 (typed intake information
discussing the fact that plaintiff apparently *ran* from the police); App. 146, Health Receiving
Questionnaire, May 19, 2006 (comments: "inmate seen by medical"); App. 149, Medical
Department Restrictions and Appliances, May 19, 2006 (comments: cane applied "per
medical").)

does not rise to the level of severity contemplated by the Supreme Court in Farmer, and by the Third Circuit as it has interpreted Farmer's "substantial risk" requirement.  See, e.g., Helling, 509 U.S. at 36; Riley, 777 F.2d at 147.  I also note that plaintiff has not furnished particularized evidence as to the subjective knowledge of any of the named supervisors concerning his placement within the MHU, or the "exceptions" to the intake screening policy allegedly made in plaintiff's case.  (See Opp'n Br. 6 (citing Doe Dep. 20:5 (in practice, exceptions made where inmate previously incarcerated within one year).)  He cannot argue that Weaver was acting under the orders of his supervisors when he directed plaintiff to move his box alone on May 8, 2006; per prison practice, Weaver was equipped with a "work party" to assist other inmates if necessary.  (See Weaver Dep. 33:17-24.)  Mr. Yudenko's evidence is therefore insufficient as a matter of law to show the deliberate indifference of Warden Guarini, Deputy Warden Seibert and Associate Warden Bodnar toward any risk to plaintiff's health or safety.  See Farmer, 511 U.S. at 842.  I will therefore grant summary judgment to defendants on this claim.  I need not consider defendants' qualified immunity defense.

          2.     Lancaster County

     Plaintiff does not address his Eighth Amendment claim against LCP or Lancaster County in his opposition papers.  I will assume that he has conceded that a claim under Monell v. New York City Dept. Of Soc. Servs. would not survive summary judgment. 436 U.S. 658, 691 (1978).  First, Mr. Yudenko has failed to show that an underlying

constitutional violation exists.  See, e.g., City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (no award of damages "against a municipal corporation based on the actions of one of its officers, when the officer inflicted no constitutional harm.")  Second, the record does not contain evidence of a policy or custom that resulted in a cognizable Eighth Amendment violation.  Id. at 663; Andrews v. City of Philadelphia, 895 F.2d 1469, 1491 (3d Cir. 1990) (policy, custom or practice must be "so permanent and well settled as to virtually constitute law").  Plaintiff has not stated a "failure to train" claim, relying as he does on the training of officers as evidence of their own culpability for alleged Eighth Amendment violations.  See City of Canton v. Harris, 489 U.S. 378 (1989) (failure to train claim requires showing of "deliberate indifference" by municipality to rights of persons with whom employee comes in contact).

If plaintiff seeks to claim LCP policy resulted in inadequate medical care, allegations of medical malpractice are not sufficient to establish an Eighth Amendment violation for inadequate medical care.  Estelle v. Gamble, 429 U.S. at 107; Davis v. Collins, 230 Fed. Appx. 172, 174 (3d Cir. 2007); see also Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); Roach v. Kligman, 412 F. Supp. 521, 525 (E.D. Pa. 1976) ("[W]here a plaintiff has received some care, inadequacy or impropriety of the care that was given will not support an Eighth Amendment claim.")  See also Rankins v. Clymer, 88-1203, 1988 U.S. Dist. Lexis 5159, at* 1-2 (E.D. Pa. June 1, 1988) (same).  I will dismiss plaintiff's Eighth Amendment claim as against Lancaster County.

B.      Plaintiff's ADA Claim

To succeed on his ADA claim,[7] Yudenko must establish: (1) he is an individual

with a disability; (2) he was denied the benefits of a public entity's program or activity for

which he is otherwise qualified, or would be qualified if reasonable modifications were

made, or was otherwise discriminated against by the public entity; and (3) he was

excluded from the program or discriminated against by reason of his disability.  29 U.S.C.

§ 706(7)(B); 42 U.S.C. § 12132 (prohibiting public entities from discriminating against

individuals with disabilities, or excluding disabled persons from participating or

otherwise benefitting from a public entity's "services, programs, or activities"); see also

Wagner v. Fair Acres Geriatric Center, 49 F.3d 1002, 1009 (3d Cir. 1995).

Questions of material fact remain as to whether Mr. Yudenko qualifies as a

"disabled person," which must be determined on a case-by-case basis.  See Toyota Motor

Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 198 (2002) ("The determination of

whether an individual is substantially limited in a major life activity must be made on a

_____

[7]Title II of the ADA is interpreted to be consistent with the Rehabilitation Act, which
contains nearly identical language.  Chisolm v. McManimon, 275 F.3d 315, 325 n.9 (3d Cir.
2001).  The present discussion is confined to the ADA, but applicable to Rehabilitation Act
claims.  Defendants do not contest that Lancaster County is unable to assert immunity under the
ADA.  See Mt. Healthy City Sch. Dist. Bd. of Educ. V. Doyle, 429 U.S. 274, 280 (1977); Rainey
v. County of Del., Civ. A. No. 00-548, 2000 U.S. Dist. Lexis 10700, at *10, n.4 (E.D. Pa. Aug. 1,
2000).  Correctional facilities such as LCP fall within the scope of "public entities" subject to
Title II of the ADA, which also applies to services, programs and activities provided within
correctional institutions.  See Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206 (1998);
Chisolm, 275 F.3d at 325.  Defendants do not contest this finding.  However, an ADA claim
cannot be brought against individual defendants, and plaintiff's claim is accordingly dismissed
against the individuals named in his complaint. See Calloway v. Boro of Glassboro Dep't of
Police, 89 F. Supp. 2d 543, 557 (D.N.J. 2000); Yeskey, 76 F. Supp. 2d at 574-75.

case-by-case basis"); see also 29 U.S.C. § 706(7)(B) (defining "handicapped individual"

as "any person who (i) has a physical or mental impairment which substantially limits one

or more of such person's major life activities, (ii) has a record of such impairment, or (iii)

is regarded as having such impairment.")  To hold that Mr. Yudenko's life activities have

not been impaired by his back and ankle injuries would ignore strong evidence to the

contrary.  Plaintiff states that he was forced to crawl on his hands and knees simply to use

the toilet in his cell.  (See Yudenko Decl. ¶ 10.)  Not surprisingly, the Rehabilitation Act

regulations specifically cite "walking" as a "major life activity."  45 CFR § 84.3(j)(2)(ii);

see Williams, 534 U.S. 184, 195 (2002).  This question cannot be resolved on summary

judgment and must go before a jury.

Plaintiff has also raised a genuine issue as to whether he was denied medication

because of his inability to walk, satisfying the second two prongs of the test under Title II

and the Rehabilitation Act regulations.  See 29 U.S.C. § 706(7)(B).  Medical services are

covered by the ADA.  Muhammad v. N.J. Dep't of Corr., Civ. A. No. 05-4999, 2006 U.S.

Dist. Lexis 62323, at *24 (D.N.J. Aug. 14, 2006) (physical therapy services).  Plaintiff

has come forward with evidence showing he was unable to get his medication because he

could not walk quickly enough to get in the medline.  He made appropriate requests and

inquiries to try and have medications delivered to his cell.  Other inmates received

medication in their cells.  (Doe Dep. 58:5-7.)  In response to his request, he was told to

leave his cell earlier, and his medications were eventually discontinued.  He was also

"punished" for failing to make it to the medline in time, when Weaver eliminated his block out time for two days.  Drawing reasonable inferences in his favor, plaintiff's ADA claim must survive summary judgment.

C.    State Law Claims

   1.    *Pennsylvania Constitution*

   I will decline to exercise supplemental jurisdiction over plaintiff's claim under the Pennsylvania Constitution.  Discretion is advisable under the circumstances, given the unsettled and complex nature of state constitutional law, and the general preference for allowing state courts to interpret their own constitutions.  See, e.g., Warren v. Twp. of Derry, Civ. A. No. 04-2798, 2007 U.S. Dist. Lexis 19537, at *41-43 (M.D. Pa. Mar. 20, 2007); 28 U.S.C. § 1367(c)(1) (stating that a court may decline jurisdiction if "the claim raises a novel or complex issue of State law"); Mulgrew v. Fumo, No. 03-CV-5039, 2004 U.S. Dist. LEXIS 14654, at *2 (E.D. Pa. July 29, 2004) ("Due to this unsettled issue of law, as to whether such a direct right of action exists [for money damages for violations of the state constitution], we believe a state court is better equipped to determine the causes of action that may be derived from the Pennsylvania Constitution."); see also Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc., 140 F.3d 478, 487 (3d Cir. 1998) (affirming court's refusal to extend jurisdiction over state law issue that would require the court to interpret state's constitution, as deferral of matter was "out of respect for the right of a state court system to construe that state's own constitution") (citing Doe

21

v. Sundquist, 106 F.3d 702, 708 (6th Cir. 1997)).

I will accordingly dismiss plaintiff's state constitutional claim without prejudice.

2.      *Political Subdivision Tort Claims Act*

Plaintiff's tort claim against the prison and its employees arises from the broken bunk incident of August 4, 2006.  He alleges that defendants' negligence in failing to provide him with a handlebar and/or their failure to maintain and repair the bunks properly, resulted in further injuries to his back and head.

The Political Subdivision Tort Claims Act, 42 Pa.C.S. §§ 8541-8564, "legislatively raises the shield of governmental immunity against any damages on account of any injury to a person or property caused by any act of a local agency or employee thereof or any other person, except as otherwise provided."  Mascaro v. Youth Study Center, 514 Pa. 351, 355-356 (Pa. 1987)(citing 42 Pa.C.S. § 8541).  As the court outlined in Mascaro, the Act "provides that liability may be imposed if two conditions are satisfied, and if the injury occurs as a result of one of eight acts described at 42 Pa.C.S. § 8542(b)."  Liability arising from real property ownership constitutes one of the Act's eight exceptions, and defendants do not dispute that fixtures such as the bunk beds in the MHU fall into this category.  See Davis v. Brennan, 698 A.2d 1382, 1383 (Pa. Commw. Ct. 1997) (noting that a shower grab bar in a prison could be a fixture if permanently attached).  While the exceptions are to be construed narrowly, I find that the bunk beds qualify under the real property exception.  See Mascaro, 523 A.2d at 1118.  Having satisfied the first

22

requirement for application of the Act, the two further threshold conditions are:

(1)     damages would be recoverable under common law or a statute creating a cause of action against one not having an immunity defense;

(2)     the injury must be caused by the negligent acts of the local agency or its employee acting within the scope of its office or duties, excepting therefrom acts of crime, fraud, malice or willful misconduct.

Id.; 42 Pa. C.S. § 8542(a)(1) and (2).

Defendants also do not discuss whether the two preconditions to liability are met in this case.[8]  Instead, defendants focus on the fact that plaintiff can only recover pain and suffering damages "in cases of permanent loss of a bodily function, permanent disfigurement or permanent dismemberment."  42 Pa. C.S. § 8553(c)(2)(ii).[9]  Defendants'

_____

[8]Even had defendants argued against common law liability under 42 Pa. C.S. § 8542(a)(1) and (2), I find that plaintiff has furnished sufficient evidence to raise a genuine issue as to defendants' negligence in the case of the bunk bed incident.  Pennsylvania courts have found that "an inmate's status is most closely to that of an 'invitee'" under common law.  Graf v. County of Northampton, 654 A.2d 131, 133-34 (Pa. Commw. 1995).  The duty of care owed by a landowner to an invitee is an "affirmative duty to protect . . . not only against known dangers but also against those which might be discovered with reasonable care."  Emge v. Hogosky, 712 A.2d 315, 317 (Pa. Super. Ct. 1998).  Plaintiff claims he slept on the floor and used his bed as a means of pulling himself up from the floor over a period of three months.  He was housed in the medical unit where employees were trained to be observant of the activities of the inmates as related to their medical needs.  The prison maintenance staff was responsible for upkeep of the bunks and Warden Guarini noted in his deposition that other bunks had previously broken in the same manner.  (See Guarini Dep. 53:18-54:9.)  A reasonable jury could find under the heightened standard of care owed to invitees that the prison staff, acting within the scope of employment, was negligent in not providing a handlebar or in not ensuring that the 15 year old bunks were secure enough.

[9]"A permanent loss of a bodily function means that the plaintiff, as a [proximate] result of the accident, can no longer perform a physical act or acts which she was capable of performing prior to injury proximately resulting from the accident, and this loss of bodily function is permanent, that this loss of bodily function will exist for the remainder of her . . . life."  Walsh v. City of Philadelphia, 526 Pa. 227, 241 (1991) (quoting Savitt v. City of Philadelphia, 557 F.

argument is inapposite to summary judgment on the question of liability, however, because plaintiff has not restricted his claim for relief to pain and suffering damages. (See Compl. 8, Relief Requested (seeking punitive damages and compensatory damages, which would include actual damages–e.g. medical costs, future lost wages–as well as pain and suffering damages).)  Furthermore, plaintiff is now wheelchair-bound, arguably as a result of the injuries he received when the bunk dislodged from the wall and fell on his body, exacerbating his preexisting back injury.  Whether an injury constitutes a "permanent loss of bodily function" is a jury question, and plaintiff's own testimony can meet his burden on this issue.  Laich v. Bracey, 776 A.2d 1022, 1025 (Pa. Commw. 2001); Alexander v. Benson, 812 A.2d 785, 788 (Pa. Commw. 2002) ("[C]ertain essential determination, including whether a plaintiff suffered a compensable injury and the extent of such an injury, are strictly within the purview of a jury.")

I must accordingly deny summary judgment on plaintiff's negligence claim against LCP and its employees under Pennsylvania's Political Subdivision Tort Claims Act.

D.      Punitive Damages

I will not strike plaintiff's claim for punitive damages at this time, leaving the question of whether defendant Weavers' conduct was "outrageous," or effected with "reckless indifference," to the time of trial.  See Karpiak v. Russo, 676 A.2d 270, 275 (Pa. Super. 1996).

_____

Supp. 321, 328 (E.D. Pa. 1983).

IV.   CONCLUSION

Based on the foregoing discussion, I will grant summary judgment to Dr. Robert Doe as to all counts of plaintiff's Complaint.  I will also grant summary judgment to Correctional Officer Weaver, Warden Guarini, Deputy Warden Seibert, Associate Warden Bodnar and Lancaster County on plaintiff's Eighth Amendment claim (Count I). Plaintiff's claim based on the Pennsylvania Constitution (Count III) is dismissed without prejudice.  Summary judgment is denied as to Count II (ADA) and as to plaintiff's negligence claim under the Pennsylvania Political Subdivision Tort Claims Act (Count III).  An Appropriate Order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ANDREY YUDENKO,    :  CIVIL ACTION
    **Plaintiff**     :
            :
 **v.**          :  NO. 06-4161
            :
VINCENT GUARINI, Warden, et al., :
    **Defendant**    :

## O R D E R

**STENGEL, J.**

**AND NOW**, this 27th day of August, 2008, upon consideration of the motions for summary judgment by defendants Brian Weaver, Lancaster County, Vincent Guarini, Lance Seibert and Robert Bodnar (Document #47), and defendant Dr. Robert Doe (Document #49), it is hereby **ORDERED**:

(1) The Motion for Summary Judgment by Dr. Robert Doe is **GRANTED** as to all counts of plaintiff's Complaint.

(2) The Motion for Summary Judgment by Correctional Officer Weaver, Warden Guarini, Deputy Warden Seibert, Associate Warden Bodnar and Lancaster County is **GRANTED, in part, and DENIED, in part**.  The motion is **GRANTED** as to plaintiff's Eighth Amendment claim (Count I). The motion is **DENIED** as to Count II, and as to plaintiff's negligence claim under the Pennsylvania Political Subdivision Tort Claims Act (Count III).

(3) Plaintiff's claim based on the Pennsylvania Constitution (Count III) is

**DISMISSED WITHOUT PREJUDICE**.


BY THE COURT:


 /s/ Lawrence F. Stengel
LAWRENCE F. STENGEL, J.